UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

METRO TRANSIT POLICE LABOR   )
COMMITTEE, INC.              )
711 Fourth St., NW           )
Washington DC 20001          )
                             )
James H. Duncan, Jr.,        )
c/o 711 Fourth St. NW        )
Washington DC 20001          )
                             )
Alanna Watkins               )
c/o 711 Fourth St. NW        )
Washington DC 20001          )
                             )
        Plaintiffs,          )
                             )
                             )
    v.                       )   Case:
                             )
WASHINGTON METROPOLITAN      )
AREA TRANSIT AUTHORITY       )
600 Fifth St., NW            )
Washington DC 20001          )
                             )
And                          )
                             )
METRO TRANSIT                )
POLICE DEPARTMENT            )
600 Fifth St., NW            )
Washington DC 20001          )
                             )
And                          )
                             )
MICHAEL A. TABORN            )
600 Fifth St., NW            )
Washington DC 20001          )
                             )
And                          )
                             )
JERI KAVON LEE               )
600 Fifth St., NW            )
Washington DC 20001          )

1

|                                                      | )      |
| ---                                                  | ---    |
| And                                                  | )      |
|                                                      | )      |
| DENISE E. MITCHELL                                   | )      |
| 600 Fifth St., NW                                    | )      |
| Washington DC 20001                                  | )      |
|                                                      | )      |
|                                                      | )      |
| Defendants.                                          | )      |
|                                                      | )      |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiffs Metro Transit Police Labor Committee, Inc. ("MTPLC" or "Union"), James H. Duncan, Jr., and Alanna Watkins, (collectively "Plaintiffs") by and through their undersigned counsel, file this Complaint against the Washington Metropolitan Area Transit Authority ("WMATA" or "Authority"), Jeri Kavon Lee, and Denise E. Mitchell, and allege as follows:

### JURISDICTION & VENUE

1. This action seeks declaratory, injunctive, and monetary relief, compensatory and punitive damages, costs and attorney fees for the deprivation of the constitutional rights of the individual Plaintiffs and as those rights are exercised by the individual Plaintiffs through the Plaintiff Union.

2. This action arises under the First Amendment of the United States Constitution, made actionable by 42 U.S.C. §1983.

3. This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §1331.

2

4. Declaratory and injunctive relief is sought pursuant to 28 U.S.C. §2201 and 2202.

5. Compensatory and punitive relief is sought pursuant to 42 U.S.C. §1983.

6. Costs and attorneys' fees may be awarded pursuant to 42 U.S.C. §1988 and Rule 54 of the Federal Rules of Civil Procedure.

7. This Court has personal jurisdiction over the Defendant Authority because the Authority maintains its principal office within the District of Columbia and conducts a large portion of its business within the District.

8. This Court has personal jurisdictional over Defendants Lee and Mitchell because they both maintain their principal place of business on a daily basis within the District of Columbia.

9. Venue is appropriate in this Court because all parties maintain their principal offices in the District and conduct a substantial portion of their business in the District.

## PARTIES

10. Plaintiff Metro Transit Police Labor Committee, Inc. is an affiliate of the Fraternal Order of Police ("FOP"), DC Lodge. The Union maintains its principal office at 711 Fourth St., NW, Washington, D.C. 20001.

11. The Union is the certified and recognized representative of a collective bargaining unit of all regular, full-time, sworn, police officers and candidates, but excluding all officers having supervisory authority and/or excluded pursuant to Section 66(b) of Public Law 92-349. See Exhibit A to the

3

Complaint, Agreement between WMATA and FOP/MTPLC, at Article 1, Sections 1 and 2(d).

12. Plaintiff James H. Duncan, Jr., is currently employed as a Police Officer/Detective by the Metro Transit Police Department and is an employee in the bargaining unit represented by the Union. Since January, 2010, Duncan has been the elected Chairman/Principal Officer of the Union.

13. Plaintiff Alanna Watkins is currently employed as a Police Officer/Detective by the Metro Transit Police Department and is an employee in the bargaining unit represented by the Union. Watkins has been the elected Recording Secretary of the Union since January 2010.

14. Defendant Washington Metropolitan Area Transit Authority ("WMATA" or "Authority") is a multi-jurisdictional entity created and governed by the Washington Metropolitan Area Transit Compact, as amended, (the "Compact"). D.C. Code. §9-1107.1, et seq.[1] The Authority maintains its principal office at 600 Fifth St., NW, Washington, D.C. 20001. WMATA acts as a government entity and its actions are "state action" as defined by federal law applying the Constitution of the United States.

15. The Authority is responsible for providing public transportation services, primarily bus and rail, throughout the District and in parts of Virginia and Maryland. The Authority operates the Metro Transit Police Department ("MTPD"), within which the bargaining unit employees represented by the Union are employed.

---

[1] For legislation by Congress, see P.L. 89-774, 80 Sta. 1324 (1966); P.L. 92-349, 86 Stat. 464 (1973); P.L. 92-517, 86 Stat. 999 (1972); P.L. 94-306, 90 Stat. 672 (1976); P.L. 100-285, 102 Stat. 82 (1988); P.K. 104-332, 110 Stat. 3884 (1996); P.L. 105-151, 111 Stat. 2686 (1997).

4

16. Defendant Michael A. Taborn is currently the Chief of the MTPD.

17. Defendant Jeri Kavon Lee is currently a Deputy Chief in the MTPD. As a Deputy Chief, Lee is a management official not within the Plaintiff's bargaining unit. Lee is sued in both his official and personal capacities.

18. Defendant Denise E. Mitchell is a civilian employee in WMATA's Office of Labor Relations. Mitchell is the primary civilian responsible for labor relations matters with the Plaintiff Union. Mitchell is sued in both her official and personal capacities.

## CONSTITUTIONAL AUTHORITY

19. The First Amendment of the United States Constitution states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

## RELATIONSHIP BETWEEN WMATA AND PLAINTIFFS

20. The Interstate Compact that created WMATA states in Section 66(b): "The Authority shall deal with and enter into written contracts with employees ... through accredited representatives of such employees or representatives of any labor organization authorized to act for such employees concerning


wages, salaries, hours, working conditions, and pension or retirement provisions." D.C. Code §9-1107.01(66)(b).

21. Section 66(c) of the Compact sates in relevant part, "In case of any labor dispute involving the Authority and such employees where collective bargaining does not result in agreement, the Authority shall submit such dispute to arbitration ….. The term 'labor dispute' shall be broadly construed and shall include any controversy … concerning any difference or questions that may arise between the parties including but not limited to the making or maintaining of collective bargaining agreements, the terms to be included in such agreements, and the interpretation or application of such collective bargaining agreements…"

22. The claims Plaintiff brings in this action are not subject to Section 66(c)'s arbitration requirement because they are allegations of constitutional violations.

## FACTUAL ALLEGATIONS

### DEFENDANTS' PATTERN OF CONDUCT TOWARDS DUNCAN AND THE UNION LEADERSHIP SINCE JANUARY 2010

23. Since Duncan's election as Chairman of the Union, he has continued to be employed full-time as an MTPD Detective within the bargaining unit represented by Plaintiff Union.

24. On January 1, 2010, Duncan became the Union's elected Chairman/President and principal officer, Alanna Watkins became the Union's elected Recording Secretary. Watkins has also continued to be employed full-time as an MTPD Detective within the bargaining unit represented by the Union..

25. Since Duncan became Chairman of the Union, labor relations between the parties have been much more adversarial than they had been in prior years when other police officers held the position of Union Chairman.

26. The Union's current administration, led by Duncan, has pursued numerous grievances to arbitration, far more than the Union pursued in the previous several years combined.

27. WMATA and MTPD management, particularly through Mitchell and Lee, have repeatedly expressed their anger over the number of grievances the Union has submitted to arbitration.

28. In January 2010, Mitchell told Union Treasurer Ken Frost, who is also employed as a full-time Detective within the bargaining unit, that the Union could not afford to take so many cases to arbitration. Frost responded that such matters were none of Mitchell's business and that the Union leadership would make such decisions.

29. In or around September 2010, WMATA's Benefits Department held several mandatory meetings with bargaining unit police officers purportedly to discuss benefits issues.

30. At those meetings, WMATA management representative Andrea Diggs told the officers in attendance that the Union's leadership, in particular Duncan,

were not acting in the best interests of the membership and should be voted out of office.

31. During the first three months of 2010, MTPD management repeatedly harassed Duncan and Watkins in retaliation for their advocacy on behalf of the Union.

32. The Union has filed a grievance in response to the improper harassment of Duncan and Watkins; that grievance is still pending at this time.

33. The Defendants have engaged in a pattern of conduct that effectively obstructs Duncan's performance of his Union duties by trying to exercise its authority over him as a police officer in retaliation for his exercise of his collective bargaining rights on his own behalf and in his capacity as Union Chairman.

## THE DECEMBER 8, 2010, ARBITRATION HEARING

34. In May 2010, the Union filed a lawsuit in this Court seeking an order to compel WMATA to arbitrate numerous grievances which the Union had submitted to arbitration; WMATA had refused to cooperate in processing to arbitration.

35. The parties agreed to settle the May 2010 lawsuit with WMATA's agreement to arbitrate the referenced grievances.

36. On December 8, 2010, a third day of arbitration hearings was held on the cases that WMATA agreed to arbitrate as part of the settlement of the May 2010 lawsuit.

37. As set forth in the Compact, the cases were presented to a tri-partite Board of Arbitration.

38. The tri-partite Board of Arbitration consisted of Union appointee Justin P. Keating, WMATA appointee Mitchell, and Neutral appointee E. William Hockenberry. Mitchell and Keating also served as advocates for their respective parties in the arbitration.

39. Pursuant to the parties' usual practice for arbitration, a court reporter was hired to transcribe the proceedings.

40. The December 8th hearing was held on the 5th floor of WMATA's headquarters, down the hall from the offices of those MTPD officials assigned to that location and down the hall from the offices of Duncan, Watkins and other Detectives in the MTPD's Criminal Investigation Division (CID).

41. Duncan was on-duty that day and had begun his regularly scheduled shift in CID earlier that morning and performed his MTPD duties until the commencement of the hearing.

42. According to the applicable collective bargaining agreement and the well established practice of the parties, unit employees who are on duty at the time of the hearing participate in the hearing as needed without formally going "off duty."

43. In attendance a the outset of the December 8th hearing, in addition to Mitchell, Keating, and Hockenberry were the following people:
    a. Duncan, whom both parties knew would be in attendance as a witness in the hearing and as the Union's party representative for the hearing.

    b. Lee, who was also expected to be a witness in the hearing as well as a MTPD representative attending the hearing.

    c. MTPD Captain Kevin P. Gaddis

    d. MTPD Captain Julious Byrd

    e. MTPD Lieutenant Earl P. Brown

44. Lee, Gaddis, Byrd, and Brown were all in MTPD uniforms and were armed with their MTPD-issued service pistols, in exposed holsters.

45. Duncan, whose current position as Detective is a "plain clothes" assignment, was dressed in a suit and tie and also armed with his MTPD-issued service pistol, also in an exposed holster.

46. Arbitration hearings such as these are generally less formal than court proceedings, so Duncan, Keating, and Hockenberry had all removed their suit jackets.

47. Before going "on the record" with the hearing and before the court reporter began transcribing the participants' statements, Lee whispered into Mitchell's ear in a volume inaudible to Keating and Duncan on the other side of the table.

48. Mitchell then requested that Duncan either remove his pistol and remove it from the room or put his suit jacket back on.

49. Keating and Duncan asked Mitchell to explain the basis for the request; Mitchell stated that the exposed firearm "made her uncomfortable."

50. Keating pointed out that the four MTPD management officials present were all carrying exposed pistols.

51. Mitchell stated that the fact that the management officials were in full uniform made their continued possession of their pistols appropriate.

52. In an effort to move forward with the important matters to be heard before the Board of Arbitration, Duncan agreed to lock his pistol up in a secured safe in his office approximately 100 feet away from the hearing room.

53. After Duncan returned, Hockenberry declared that the matter would proceed "on the record" and the court reporter began transcribing.

54. During the early part of the hearing, MTPD Captain Lance B. Ware entered the hearing room.

55. Ware was scheduled to be a witness for WMATA.

56. Ware was wearing a suit and tie and was also carrying his MTPD-issued pistol.

57. During a short break between witnesses later in the morning, but while the parties were still "on the record," the following exchange took place:

> MR. KEATING: I would like to stay on the record. I still need to clear this up. She attacked the Union's chairman's integrity and trustworthiness. I want an on-the-record explanation or I want an apology. I am not beating a dead horse. This is a serious problem.
> MS. MITCHELL: I will address that. Arbitrator Hockenberry, on the first day and the second day Mr. Duncan said repeatedly that he was not in the chain of command when he was doing Union business. And not being in the chain of command and doing Union business he is, quote, "an employee." Employees don't walk around with a gun. Captain Ware is in a business suit, but I don't see a gun. His gun is covered. Since Chairman Duncan is not, quote, "in the chain of command" based upon his own testimony and is just an employee, he is not entitled to have a gun here. There is no apology. There was no intent to embarrass Detective Duncan. It was just merely a matter of he could have put his jacket

11

on or not just as Captain Ware has his jacket on.. He said he was not conducting the business of -- he's just a regular employee. He's not in the chain of command. If he's not in the chain of command, he's not entitled to be wearing a gun. All of these other people, they are management people. They are in uniform. They are working on behalf of the Authority in this issue. By Duncan's own testimony he's not acting in that stead, and we have plenty of transcript notes on that. So I don't think I owe Mr. Duncan an apology, and since we're on the record that's my explanation.

MR. KEATING: I will say that he's a sworn police officer. He's actually has the authority, and arguably the obligation, to carry his firearm with him at all times when he's in the Transit zone. But if you see this for the nonsense that it is, Mr. Hockenberry, I'm comfortable with that and I'll drop it. But I don't like opposing counsel attacking my chairman's integrity for something this nonsensical. Like I said, I've had my disagreements with some of these gentlemen, but I'm quite sure nothing stupid is going to happen. They're trustworthy when it comes to such things of enormous responsibility. This is nonsense.

MS. MITCHELL: And again, Mr. Hockenberry, as I said before, Mr. Duncan had the option of simply putting on his jacket. I just asked that the gun be covered or --

MR. KEATING: That distinction doesn't make any sense at all.

MS. MITCHELL: It does in terms of a comfort level. The gun is covered. These people are in uniform. It is a huge distinction for me as an advocate --

MR. KEATING: That makes no sense at all.

ARBITRATOR HOCKENBERRY: Don't interrupt her, please. Go ahead.

MS. MITCHELL: -- as an advocate in this case. When I see a police uniform and I see someone in uniform with a gun, it is not necessarily disturbing. But again, with his wn testimony about not being in the chain of command when he's doing, quote, "Union business," that seems to me that he could have just put the jacket on. It was no attempt to embarrass him. As a matter of fact, I meant to have the conversation out in the hall. I did not think that it was going to be that big of a deal. He could have put the jacket on. He can go get his gun as long as he puts the jacket on as Captain Ware has. That's all.

ARBITRATOR HOCKENBERRY: Anything else?

> MR. KEATING: A suggestion to a police officer that he's not qualified to carry his gun when all of his colleagues are is nothing short of an attack on his integrity. Everybody knows that.
> MS. MITCHELL: Well, if push comes to shove, I guess we could have some testimony on this particular thing, but these cases are about timeliness. There was no intent on my part whatsoever to, quote, "embarrass" Detective Duncan. I don't understand what's embarrassing about putting your jacket on. I don't understand what that's about. There was no intent. There was no intent.
> ARBITRATOR HOCKENBERRY: All right. Your positions are on the record. Folks, I believe it's a tempest in a teapot. With rare exception most everybody in this room is armed. I don't care whether the gun is displayed or not. These officers are in uniform, the gun is displayed. Chairman Duncan's gun was displayed. If you found that offensive, you made your comments and Detective Duncan, I believe, courteously removed his weapon.
> MS. MITCHELL: Uh-huh. And I appreciate that.
> ARBITRATOR HOCKENBERRY: I think we've discussed it enough.

58. At that time, the parties proceeded with the arbitration.

59. Mitchell's and Lee's actions put Duncan in the untenable position of deciding between (1) rejecting the unlawful and improper request, and likely delaying the arbitration proceedings and (2) consenting to the unlawful request in an effort to perform its representative functions in the arbitration proceeding.

60. During the discussions both on and off the record about the firearm dispute among Keating, Mitchell, and Hockenberry, Lee repeatedly whispered statements into Mitchell's ear, inaudible to Duncan and Keating.

61. Throughout the day-long hearing, numerous MTPD officers (both bargaining unit and management) roamed the halls outside the hearing room in "plain clothes" attire with their pistols exposed.

62. Several hours into the hearing, during a break in the proceedings, Mitchell showed Keating a copy of MTPD General Order 131.

63. Mitchell told Keating that General Order 131 provided the basis for her request that Duncan remove his firearm during the hearing.

64. General Order 131, attached hereto as Exhibit __, does not prohibit Duncan from carrying his firearm exposed under the circumstances as they existed at the time of Mitchell's request.

65. The revocation of an officer's MTPD issued firearm can only be done according to written regulations issued by the MTPD.

66. A civilian does not have the authority to invoke the procedures for revoking an officer's MTPD issued firearm.

67. The procedures for revoking an officer's MTPD issued firearm were not followed with regard to Duncan on December 8th.

68. Plaintiffs are not aware of any previous Chairman of the Union being requested to forfeit his firearm during any proceedings involving the Union and management.

69. By their actions, Mitchell and Lee forced Duncan into deciding whether to forego his due process rights as a MTPD police officer or delay the process for resolving important Union grievances.

**THE JANUARY 12, 2011, UNION MEETING AND ITS FALLOUT**

70. The Union held its regular monthly membership meeting on January 12, 2011.

71. It has been the well established practice for at least twenty years that officers may attend the monthly meeting while on-duty provided they remain attentive to their police radios and respond to any calls immediately.

72. Approximately 100-120 officers attended the January 2011 meeting.

73. A resolution was voted on by the members declaring "No Confidence" in Taborn and his management team.

74. On voice vote, the membership in attendance voted unanimously to approve the resolution.

75. One officer in attendance abstained from the vote.

76. Beginning on January 13, 2011, several officers were questioned by MTPD management regarding their attendance at the meeting and were ordered to provide written statements regarding their attendance at the meeting if they were on duty at the time of the meeting.

77. On or before January 19, 2011, a well known "blog" dedicated to WMATA issues published a story describing the "No Confidence" resolution.

78. On January 20, 2011, Lieutenant Eric Brown of the MTPD's "Office of Professional Responsibilities and Investigations" informed Plaintiff Duncan that Duncan was under "Administrative Inquiry" by the MTPD for allegedly testifying falsely at an arbitration hearing.

79. The December 8, 2010, hearing referenced herein was the most recent arbitration hearing prior to January 2, 2011.

80. Plaintiff Duncan did not testify falsely at that hearing.

81. MTPD officials never informed Duncan of any investigation into his false testimony until after the Union passed the "No Confidence" resolution.

82. Later in the day on January 20, 2011, Defendant Taborn telephoned Plaintiff Duncan and demanded to know the details of what transpired at the January Union meeting.

83. Plaintiff Duncan informed Taborn that he, Duncan, would prefer that Taborn take up such discussions with the Union's attorneys.

## THE DEFENDANTS' ACTIONS IN THE CONTEXT OF
## THE PARTIES' ONGOING CONTRACT NEGOTIATIONS

84. The parties' collective bargaining agreement expired on September 30, 2010.

85. The parties have been in negotiations since September 2010 for a successor agreement.

86. The Defendants' actions as described above have the very real effect of undermining and obstructing the Union, and its elected leadership, in their efforts to represent the bargaining unit officers in general and specifically to negotiate the successor collective bargaining agreement.

## COUNT I

## DEPRIVATION OF ALL PLAINTIFFS'
## FIRST AMENDEMENT RIGHTS

87. The allegations set forth above are incorporated by reference.

16

88. Defendants' actions are the actions of a government entity for purposes of constitutional analysis.

89. The First Amendment of the Constitution guarantees the rights of the individual Plaintiffs to associate with one another, and in this context, to choose their union representatives and to effectively speak through those union representatives with regard to their employment at the MTPD.

90. Defendants' actions amount to a concerted effort to undermine the individual Plaintiffs' association, representation, and speech rights and to coerce them into not exercising those rights.

91. The Defendants' actions towards Duncan and towards the Union collectively have undermined the Union's members' constitutional rights.

92. In the current context of the Union's efforts to negotiate a successor collective bargaining agreement, the Defendants' actions have harmed and continue to harm the Plaintiffs' rights in a very tangible and direct manner.

WHEREFORE, Plaintiff pray that the Court:

1. Determine that Defendants have violated the Constitutional rights of all individual Plaintiffs and the other police officers in the Union's bargaining unit.

2. Order the Defendants to cease and desist from subjecting the individual Plaintiffs and all other police officers in the Union's bargaining unit to coercion in the exercise of their First Amendment rights of free association.

3. Enjoin the Defendants from continued investigation of Plaintiff Duncan for allegations that were known to the MTPD prior to January 12, 2011.

4. Enjoin Defendants Lee and Mitchell, as a result of their conduct that is irreparably injurious to Plaintiffs' rights, from having any further involvement in labor relations between WMATA, MTPD, and the Union.

5. Issue a Declaratory Judgment that the MTPD cannot take any further action to deprive Duncan of his police powers without following the Constitutional and MTPD requirements of due process.

6. Order the Defendants to issue written public statements, distributed directly to all employees in the bargaining unit, acknowledging the Defendants' deprivations of the employees' Constitutional rights and agreeing to no such further deprivations, on pain of contempt of this Court.

7. Find the Defendants jointly and severally liable for monetary damages in an amount determined by this Court for the deprivations of the constitutional rights cited herein.

8. Compensate the individual Plaintiffs Duncan for emotional, mental and physical distress incurred as a direct result of Defendant's repeated harassment.

9. Order the Defendants to reimburse Plaintiffs for reasonable attorneys fees that Plaintiffs' attorneys could charge in this market for work of the type involved in this action.

10. Order Defendants to reimburse Plaintiffs for all costs incurred in this litigation.

11. Such other relief as this Court may deem just and proper.

Respectfully submitted,

*/s/ Jonathan Axelrod*

Jonathan G. Axelrod (Bar #210245)
Justin P. Keating (Bar # 475602)
BEINS, AXELROD, P.C.
1625 Massachusetts Ave., NW   Suite 500
Washington DC 20036
Telephone: 202.328.7222
FAX: 202.328.7030
jaxelrod@beinsaxelrod.com
jkeating@beinsaxelrod.com

**ATTORNEYS FOR THE PLAINTIFFS**